CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

MAR 25 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ANGEL R. RATCLIFFE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:08cv310 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

### REPORT AND RECOMMENDATION

Plaintiff Angel R. Ratcliffe ("Ratcliffe") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "Act"). On appeal, Ratcliffe contends that the Administrative Law Judge ("ALJ") erred by finding her able to return to her former sedentary work despite her history of fainting episodes. After carefully reviewing the record, Ratcliffe's medical history does not corroborate the severity of the disability she claims. As such, the undersigned finds that the ALJ's decision is amply supported by substantial evidence and RECOMMENDS that the Commissioner's decision be affirmed.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id.

(alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working;

(2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Ratcliffe was born in 1980 (Administrative Record, hereinafter "R." 17, 58, 62, 312, 353), and at the time of the ALJ's decision was considered a "younger individual" under the Act. 20 C.F.R. §§ 404.1563(b), 416.963(b). Ratcliffe graduated from high school and attended one year of college. (R. 17, 355.) Prior to the alleged onset date, Ratcliffe worked as a cashier, telemarketer and stocker. (R. 17, 66, 72, 357-58.)

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

Ratcliffe alleges a disability onset date of April 29, 2001, due to neurocardiogenic syncope, juvenile rheumatoid arthritis, and ulcers. (R. 17, 58, 62, 65.) Her application for benefits was rejected by the Commissioner initially and again upon reconsideration. An administrative hearing was convened before an ALJ on February 1, 2006. (R. 345-402.) In determining whether Ratcliffe was disabled under the Act, the ALJ found that she had medically determinable impairments, including neurocardiogenic syncope/vasovagal syndrome and affective disorder, that qualify as severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. 19, 20.) The ALJ also found that Ratcliffe has the RFC to lift and/or carry ten pounds, stand and/or walk up to two hours in an eight hour workday, and sit for up to six hours with normal workday breaks. (R. 20.) The ALJ held that Ratcliffe can perform jobs that require only minimal standing or walking at one time; do not require operation of a motor vehicle; do not involve climbing ladders, ropes or scaffolds; do not require more than occasional bending or balancing; and do not involve exposure to unprotected heights, hazards or moving machinery. (R. 20-21.) Finding Ratcliffe can perform her past relevant work, the ALJ held that she is not disabled under the Act. (R. 21.) The Appeals Council denied Ratcliffe's request for review, and this appeal followed. (R. 6-8.)

### III

On appeal, Ratcliffe argues that the ALJ did not properly consider the impact of her impairments on her functional ability when he found that she retains the residual functional capacity to perform work at a reduced sedentary level of exertion. Ratcliffe further claims the ALJ erred in his credibility assessment and by ignoring witness

4

statements in the record regarding her functional limitations. For the reasons outlined below, the undersigned finds that the ALJ's decision is supported by substantial evidence.

### A. Objective medical evidence of neurocardiogenic syncope.

The ALJ recognized that neurocardiogenic syncope[2] is a severe impairment. (R. 20.) Basically, Ratcliffe alleges that she is disabled because she suffers from fainting spells. The medical etiology of such fainting episodes is extremely difficult to demonstrate, and Ratcliffe's condition is diagnosed predominantly by history from the patient and eyewitnesses. (R. 303.) While the record does contain one category of test results consistent with a syncope diagnosis, referred to as the tilt table test, (R. 222-23, 225-29, 243-49, 305, 342, 339-341; see also R. 303, 308), there is scant objective medical evidence documenting the severity of the fainting episodes claimed by Ratcliffe.

Although Ratcliffe testified that she experiences three to four episodes of presyncope symptoms and one episode of fainting every two weeks (R. 186), her medical records, spanning many years, reflect only one syncopal episode resulting in medical treatment. Ratcliffe presented to the emergency room when she fainted after stepping out of a hot bath on December 31, 1997. (R. 149, 220.) A few days later, on January 2, 1998, Ratcliffe saw Dr. Rivero, a cardiologist, who noted emergency room records revealed no significant physical findings or abnormalities. (R. 220.) Upon examination, Ratcliffe's blood pressure was 92/66, a reading consistent with her other visits, and she had a heart rate of 52 with regular rate and rhythm. (R. 220.) An electrocardiogram

---

[2] Syncope is defined as a temporary suspension of consciousness due to generalized cerebral ischemia; called also *faint*. Dorland's Illustrated Medical Dictionary 1807 (30th ed. 2003).

5

showed sinus bradycardia[3] at a rate of 50 beats per minute. (R. 220.) Dr. Rivero diagnosed Ratcliffe with syncope secondary to vasovagal causes and prescribed Pindolol. (R. 221.) He instructed her to lie on her back and raise her legs above her heart next time she felt lightheaded. (R. 221.)

Plaintiff did not see Dr. Rivero again for a number of years,[4] until March 15, 2004. (R. 184.) With the exception of tilt table testing which confirmed the syncope diagnosis in May, 1999 (R. 222-23, 225-29, 243-49, 305; see also R. 303, 308), there are no medical records from the intervening six years documenting a fainting episode for which Ratcliffe sought medical treatment. Ratcliffe testified at the administrative hearing that this six year gap in treatment was the result of a lack of insurance and money. (R. 359-60.) Quite the contrary appears true from review of Ratcliffe's medical history, as during this period, Ratcliffe made many trips to the doctor's office and emergency room, complaining of numerous ailments other than syncope, including ear pain, respiratory symptoms, shoulder pain, neck pain, right flank pain, and chest pain. (R. 140, 147, 168, 169, 170, 172, 173, 174, 177.) Review of the medical records of Ratcliffe's treatment from 1998 through March 15, 2004 does not support her assertion of a severe problem with fainting, as these records do not contain any visits to health care providers seeking treatment for fainting, passing out, or a syncopal episode.

Instead, when she presented to Dr. Rivero in March, 2004, Ratcliffe actually reported a decrease in syncopal episodes. (R. 184.) Aside from some lightheaded

---

[3] Sinus bradycardia is a slow sinus rhythm, with a heart rate of less than 60 beats per minute in an adult; it is common in young adults and in athletes but is also a manifestation of some disorders. Dorland's Illustrated Medical Dictionary 246 (30th ed. 2003).

[4] While Dr. Rivero's notes state Ratcliffe had not been seen at his office in three years (R. 184), the medical records in the administrative transcript reveal it had been over six years since she had been treated by Dr. Rivero.

episodes, she was "doing well." (R. 184.) Dr. Rivero again prescribed Pindolol for the neurocardiogenic syncope. (R. 184.)

Ratcliffe returned to see Dr. Rivero six months later, on September 14, 2004, and reported that she continued to have problems with passing out at any given time with no associated symptoms. (R. 181.) Ratcliffe stated that she stopped taking Pindolol because "she was not tolerating the drug." (R. 181.) Dr. Rivero's examination of Ratcliffe was normal, and he recommended she seek a second opinion at UVA. (R. 181.) During this visit, Dr. Rivero also filled out a medical evaluation form[5] for Ratcliffe, indicating that she cannot place light items on shelves higher than her head and that she could not work, as she "may pass-out at any time." (R. 182-83.) On this form, Dr. Rivero failed to note any specific limitations in terms of Ratcliffe's ability to lift, climb, sit, stand, walk or drive. (R. 182.) He also stated the condition did not hinder her ability to care for her child, as he noted that she has assistance at home. (R. 183.)

Upon referral from Dr. Rivero, Ratcliffe was seen by Dr. Ferguson at the UVA Heart and Vascular Center on November 11, 2004, and she reported that she had been experiencing three to four episodes of presyncope and one episode of syncope every two weeks. (R. 186.) She stated it takes her ten minutes after an episode to get back to her feet. (R. 186.) A physical examination was unremarkable,[6] and Dr. Ferguson noted Ratcliffe was not an appropriate candidate for pacemaker therapy. (R. 187.) Dr. Ferguson explained to Ratcliffe that patients frequently grow out of their syncope

---

[5] On brief, Ratcliffe describes this as a TANF (Temporary Assistance for Needy Families) form. Pl.'s Br. 4.

[6] Records reveal that a "12 lead ECG shows normal sinus rhythm with quite marked sinus arrhythmia." (R. 187.) Sinus arrhythmia is the physiologic cyclic variation in heart rate related to vagal impulses to the sinoatrial node, which can be linked to or independent of the phases of respiration. It is common, particularly in children, and is not considered abnormal. Dorland's Illustrated Medical Dictionary 133 (30th ed. 2003).

7

symptoms in their late 20s, and the key to preventing injury is to make changes in posture at the onset of symptoms. (R. 187.) He recommended Ratcliffe try two preventative measures: postural training by raising the head of her bed by 12 inches above the foot, and increasing her fluid and salt intake each day. (R. 187.) Dr. Ferguson noted:

> I do not think that further investigation is warranted at this stage and I am hoping that these simple preventative measurements go some way to alleviating what appears to be a difficult problem. Unfortunately I do not think that we have more to offer her at this stage.

(R. 187.) In a letter to counsel, Dr. Ferguson stated that the most effective measures to prevent episodes are to keep well hydrated and sit or lie down should she get an onset of dizziness. (R. 303-304.)

On August 29, 2006, Dr. Choubey at the New River Valley Heart Clinic performed a resting EKG, which showed normal sinus rhythm with no acute change. (R. 336.) A treadmill test was also negative, revealing no significant arrhythmia, and adequate heart rate and blood pressure response. (R. 336.) A tilt test on September 12, 2006 was positive for neurocardiogenic syncope but, when repeated, showed significant improvement with beta blockers. (R. 340, 342.)

With the exceptions of two visits to Dr. Rivero, the 2004 evaluation by Dr. Ferguson and the 2006 testing performed by Dr. Choubey, none of Ratcliffe's many visits for medical care between 2001 and 2006 sought treatment for complaints of fainting, passing-out, or syncope. The medical records that do mention syncope contain nothing more than a repetition of Ratcliffe's alleged symptoms or a history of the condition, reported by her.

8

At the administrative hearing, a medical expert, Dr. Stevens, testified as to the dearth of objective medical evidence in the record to support Ratcliffe's claims regarding the severity of her condition. (R. 386.) Dr. Stevens, a neurosurgeon, opined that the fact Ratcliffe did not seen Dr. Rivero for a number of years was "an important aspect of the severity of her difficulties," and even though she had not been taking any medication, she had apparently done fairly well. (R. 381.) Dr. Stevens further noted that the diagnosis of neurocardiogenic syncope was made strictly by Ratcliffe's claimed history, and no doctor has described her condition as severe. (R. 386.) In his RFC determination, the ALJ adopted Dr. Stevens' recommended restrictions, such as not working at heights, not working around dangerous machinery, not working in a situation where should be a danger to herself or others and avoiding use of automotive equipment. (R. 21, 382.)

Based on this medical record, substantial evidence supports the ALJ's determination that Ratcliffe can perform a reduced range of sedentary work, which involves lifting and carrying no more than 10 pounds, sitting for 6 hours and standing/walking for 2 hours. The ALJ properly took into account the limitations one would expect for someone who suffers from syncopal episodes, by restricting her to standing and walking only 2 hours in an 8-hour workday and by limiting her to work that does not require operation of a motor vehicle, does not involve climbing ladders, ropes or scaffolds, does not require more than occasional bending or balancing, and does not involve exposure to unprotected heights, hazards, or moving machinery. (R. 21.) In this

9

regard, the ALJ's RFC determination is more restrictive than the opinion rendered by the state agency physicians.[7] (R. 204-11.)

Certainly, Dr. Rivero filled out a medical evaluation form stating Ratcliffe can "pass-out at any time" and will not be able to work. (R. 182-83.) However, this opinion appears to be supported only by Ratcliffe's subjective complaints to Dr. Rivero. Ratcliffe has only sought medical treatment after a syncopal episode once, in 1997. (R. 149, 220.) Although Dr. Rivero saw Ratcliffe shortly thereafter and prescribed a medication for her symptoms, there are no records of Ratcliffe complaining of syncope again until March, 2004. During her March, 2004 visit to Dr. Rivero, Ratcliffe noted a decrease in syncopal episodes. Notwithstanding this extremely sketchy history, Dr. Rivero completed a form on her next visit in September, 2004, stating that Ratcliffe could not work, without listing any specific work restrictions. Ratcliffe was seen by doctors other than Dr. Rivero many times between 1998 and 2004. The absence of any recurring or significant complaint of syncope[8] stands in stark contrast to Ratcliffe's statement to Dr. Rivero, which he noted on the medical evaluation form, that she may pass out at any time. Ratcliffe's treatment has been conservative and includes simple, preventative measures such as postural changes, raising the head of her bed, and increasing her fluid intake. (R. 187, 221.)

---

[7] The state agency physicians found that Ratcliffe can occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk 6 hours and sit for a total of 6 hours in an 8-hour workday. (R. 205.)

[8] One note from Giles County Family Practice in July, 2002 makes a passing reference to a syncopal episode. (R. 163.) After Dr. McBride recommended discontinuing Ratcliffe's Florinef prescription and starting her on a beta blocker, Ratcliffe stated she preferred to stay on Florinef, as she "had a syncopal episode while on Atenolol," a beta blocking blood pressure medication. (R. 163.) It appears from the record that Ratcliffe was referring to the 1997 episode when she fainted after stepping out of a hot bath, which occurred while she was taking Atenolol. Thereafter, Dr. Rivero recommended discontinuing the drug and prescribed Pindolol. (R. 220.)

The medical evidence simply does not support Ratcliffe's claims as to the severity of her condition and her inability to work. The Act requires more than an individual's alleged symptoms to establish disability. "Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

As such, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence and that Dr. Rivero's contrary opinion is undermined by Ratcliffe's own medical history and RECOMMENDS dismissal of this appeal.

### B. Ratcliffe's credibility regarding the severity of her condition.

The ALJ's credibility assessment is also supported by the evidence of record. There are no objective findings as to the severity of Ratcliffe's condition and frequency of her syncopal episodes, other than what she reports.

When faced with conflicting evidence contained in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007). Accordingly, the ALJ is not required to accept Ratcliffe's testimony that she is totally disabled by virtue of her syncopal episodes, and instead must determine through an examination of the objective medical record whether Ratcliffe has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. See Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or

11

severity, but the pain the claimant alleges she suffers."). A claimant's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. § 416.928(a). Subjective evidence cannot take precedence over objective medical evidence or the lack thereof. Craig, 76 F.3d at 592 (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). The ALJ must determine whether Ratcliffe's testimony about her symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; SSR 95-5p.

There are many aspects of the record that support the ALJ's credibility finding. For example, Ratcliffe stated on her disability application that her doctor does not want her to drive because she is subject to passing out due to a heart condition. (R. 65.) However, there is no evidence that she is limited in her ability to drive; in fact, she has an unrestricted driver's license (R. 364) and drives on a daily basis. (R. 369.) Ratcliffe describes her heart condition by stating that she has a valve in her heart that does not close, resulting in blood pooling in her legs and feet, causing her to pass out. (R. 65.) However, a 1997 letter from J. Craig Barnett, M.D., of the Cardiology Associates of Virginia states Ratcliffe has "a mild heart rhythm problem. This is not dangerous. This is not life threatening and should not be considered an impediment, or she should not be considered ineligible for any activity." (R. 232 (emphasis in original).) Dr. Barnett encouraged her to be as active as possible. (R. 231.)

On her disability application, Ratcliffe also claimed she suffers from arthritis

12

that affects all her joints, and stated she has difficulty walking due to knees, hips and back and joints that "lock up so that I am unable to use them at all." (R. 65.) Yet a 1993 bone scan reveals only a "possibility of rheumatoid arthritis," (R. 293), and a new patient appointment form for Carilion Rheumatology notes in 2005 that Ratcliffe reported a history of juvenile rheumatoid arthritis, but her labs are now all normal. (R. 256.) Likewise, Dr. Robert Johnson stated on January 25, 2006 that despite having a diagnosis of juvenile rheumatoid arthritis for over ten years, there did not appear to be evidence of erosion, deformity or synovial proliferation, and there was no laboratory confirmation of the disease. (R. 299.) Dr. Johnson noted he wanted to see the bone scan from which Ratcliffe was originally diagnosed. (R. 299.)

Further eroding her credibility, Ratcliffe reported to Dr. Ferguson that it takes her ten minutes to get back to her feet after one of her syncopal episodes. (R. 186.) However, at the administrative hearing, she testified that it took her forty-five minutes to get up and function after a spell, because she has to "allow the blood to return from my feet back up to my chest." (R. 372-73.) Ratcliffe also told Dr. Ferguson in November, 2004, that she experiences three to four episodes of presyncope and one episode of syncope every two weeks. (R. 186.) However, notes from Dr. Kishore at the Gastroenterology Clinic of the New River Valley in September, 2005, reveal that Ratcliffe claimed to pass out three times per week. (R. 254.) At the administrative hearing, she testified that she has spells that cause her to fall down two to three times per month and gets warning signs of dizziness without falling two to three times per week. (R. 372.)

13

Ratcliffe claims that Dr. Rivero stated she could not drive for more than fifteen minutes and could not sit or stand for long. (R. 361.) However, no such restrictions are reflected in the record.[9] Although Ratcliffe reports passing out and falling in a number of stores including Home Depot, Kmart, and Wal-Mart, there are no incident reports in the record to document these episodes, and Ratcliffe testified that she does not recall ever filling out such a report. (R. 376-77.)

Moreover, Ratcliffe's daily activities are not consistent with someone who is totally disabled from all employment. She is the primary caregiver for her son. (R. 354-55.) While she chooses to spend the majority of her day with her mother, she maintains her own residence, where she sleeps and cares for her son in the mornings and evenings. (R. 80-81.) She prepares meals,[10] cleans, does the laundry, vacuums, pays bills, bathes her son, puts him to bed, and watches television. (R. 81, 82, 83, 368.) No doctor has restricted her ability to drive, she does not have a restricted license (R. 364), and she drives to and from her mother's house daily. (R. 369.) On her disability application, Ratcliffe indicated she goes out everyday without assistance and shops once per week. (R. 83.) She testified that she can lift her son, who weighs 46 pounds (R. 363), and she can bend, crouch and squat; push a full shopping cart; reach the upper cabinets; open doors and jars; and climb stairs. (R. 364.)

At the administrative hearing, Dr. Stevens testified that he has "a hard time putting together [her testimony and the medical records] in regards to severity of her

---

[9] While Dr. Rivero did check a box on a TANF form stating Ratcliffe would not be able to work at the end of her treatment period, he did not indicate that Ratcliffe is restricted in her ability to drive and/or her ability to stand and sit for long periods of time. (R. 182-83.)

[10] On her disability application, Ratcliffe indicated she prepares meals (R. 80, 82); however, at the administrative hearing she testified that she does not cook. (R. 367.)

14

condition." (R. 380.) He stated that from the medical records he "gets the impression that [the condition] should be reasonably controlled without too much difficulty." (R. 381.)

The evidence of record does not support the level of impairment Ratcliffe claims. Accordingly, the court finds no reason to disturb the ALJ's credibility assessment. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Allegations of subjective symptoms, without more, are insufficient to establish disability. Craig v. Chater, 76 F.3d 585, 592 (4th Cir. 1996). Substantial evidence supports the ALJ's credibility determination.

### C. Witness statements documenting Ratcliffe's syncopal episodes.

Ratcliffe argues that the ALJ erred by ignoring the witness statements in the record describing her limitations. Pl.'s Br. 9. Notwithstanding his failure to specifically cite to these statements in his written opinion, the ALJ's decision is supported by substantial evidence. The ALJ is not obligated to discuss every single piece of evidence in the record, and his failure to cite a specific piece of evidence is not an indication that the evidence was not considered. See Green v. Shalala, 51 F.3d 96 (7th Cir. 1995) ("A written evaluation of each piece of evidence or testimony is not required."); Brewer v. Astrue, No. 7:07cv24, 2008 WL 4682185, at *3 (E.D.N.C. Oct. 21, 2008) ("ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not considered."). "[I]t is neither necessary nor practical for the ALJ to describe and explain every single piece of evidence in the record which he has considered in making his

15
Case 7:08-cv-00310-SGW-mfu Document 22 Filed 03/25/09 Page 15 of 19 Pageid#: 85

credibility determination." Johnston v. Astrue, No. 4:07cv70, 2008 WL 2397541, at *3 (E.D.N.C. June 12, 2008).

It is clear from the ALJ's opinion that he did take into account the fact that Ratcliffe suffers from syncope and occasionally passes out, which is exactly what the witness statements in the record document. A letter from a friend discusses an incident in 2005 when Ratcliffe collapsed for a minute or two, and was disoriented for several minutes thereafter. (R. 306.) A school administrator recalled Ratcliffe having health problems which would require her to leave school early. (R. 307.) Additionally, Ratcliffe's parents wrote a letter stating she has had "spells" since she was four years old (R. 112-13), and two friends and a pastor recalled Ratcliffe passing out at a wedding when she was about 14 years old. (R. 114-17.) The ALJ did not err by failing to specifically mention these letters, and it is clear from his opinion and RFC assessment that he took Ratcliffe's syncope into account in his disability determination.

Considering the conservative and preventative nature of Ratcliffe's treatment, the minimal clinical findings and lack of objective evidence to support the level of severity she claims, and her range of daily activities, the undersigned finds that substantial evidence supports the ALJ's finding that Ratcliffe is able to perform a reduced range of sedentary work. The ALJ properly took into account the impact of Ratcliffe's impairments on her functional ability.

## IV

Ratcliffe also argues that the ALJ had a duty to develop evidence regarding the possibility of a medically determinable mental impairment. Pl.'s Br. 13. This claim lacks merit. "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues

necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) (citing Walker v. Harris, 642 F.2d 712, 714 (4th Cir.1981) and Marsh v. Harris, 632 F.2d 296, 300 (4th Cir.1980)). If the record is adequate to make a disability determination, however, the ALJ does not have an obligation to obtain additional information from medical sources. France v. Apfel, 87 F. Supp. 2d 484 (D.Md. 2000).

In this case, the evidence before the ALJ concerning Ratcliffe's mental impairment included a diagnosis from Dr. Rivero in March, 2004 of "probable anxiety," following Ratcliffe's complaint of "personal problems at home with some degree of stress." (R. 184.) Dr. Rivero prescribed 10 mg per day of Prozac. (R. 184.) On September 14, 2004, Dr. Rivero again diagnosed Ratcliffe with anxiety. (R. 181.) However, office notes from October 26, 2004 reveal Ratcliffe denied depression, anxiety and suicidal ideation. (R. 292.) Likewise, notes from November 11, 2004 reveal Ratcliffe had no depression and no need for psychiatric medications. (R. 186.) Dr. Choubey noted on August 29, 2006 that Ratcliffe has no history of depression or anxiety. (R. 343.)[11] The state agency physicians found her to have an affective disorder, not severe, with no more than mild limitation of functioning. (R. 189-202.) Under these circumstances, the ALJ had no obligation to further develop the record because there was sufficient evidence to make a fair assessment of the claimant's mental impairments. Therefore, the undersigned recommends that the ALJ's decision be affirmed.

---

[11] The undersigned notes that the ALJ's opinion references an office visit to Dr. Lee on July 22, 2005, and indicates Ratcliffe was being followed for affective disorder. (R. 18.) However, it appears that this progress note from Dr. Lee actually refers to a different patient and was included in the record in error. (R. 309).

17

## V

At the end of the day, it is not the province of the reviewing court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence and, in this case, substantial evidence supports the ALJ's opinion. In recommending that the final decision of the Commissioner be affirmed, the court does not suggest that Ratcliffe is totally free of any symptom. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Ratcliffe's claim for benefits and in determining that she did not demonstrate that her fainting condition was so severe that it would prevent her from performing any work. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the undersigned RECOMMENDS that the Commissioner's decision be affirmed and the defendant's motion for summary judgment be granted.

The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. §

18

636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

ENTER: This 25th day of March, 2009.

Hon. Michael F. Urbanski
United States Magistrate Judge